Tylenol 08-1098 Amazin' Raisins International Incorporated against Ocean Spray Cranberries Incorporated Ms. Zimmerman Thank you, Your Honor. May it please the Court, this case is about a process for making a dried fruit product that has a flavor different from its natural flavor. And the way that that's done in the context of the 861 patent, the Amazin' Raisins patent at issue in this lawsuit, is by starting with a fruit that has had a sufficient portion of its natural moisture removed, such that there's room to insert the infusion syrup containing a new flavoring agent and a miscigilant, and creating, for example, a strawberry-flavored raisin or an orange-flavored cranberry. Now Ocean Spray's accused process does exactly the same thing. It starts with a cranberry that has had moisture removed. In fact, almost all of the natural moisture of the cranberry has been removed at the stage when it is a characterized cranberry. Isn't the first issue of the district court's construction of the term dried fruit? That is, Your Honor. Which is defined in the specification to include 10 to 18 percent moisture? Your Honor, respectfully, I disagree that that's a definition in the specification. I think the specification says that fruits that may be used in this invention are fruits that have 10 to 18 percent, but the specification also talks about other types of fruits that can be used in this invention, such as prunes. Are there other quantities of moisture set out other than within the range of 10 to 18 percent, or approximately that, in this spec? To those of skill in the art reviewing the specification, yes, because the patent specifically says that prunes, apricots, peaches, pears, and apples can also be used as dried fruits within the context of this invention. At the time that this patent was filed in 1990, the Code of Federal Regulations makes clear that those fruits can be dried fruits provided they've had the greater portion of their moisture removed, not 10 to 18 percent. But I think there's other things in the specification that also reveal that what's necessary for this invention to work is not that the fruit have some specific absolute moisture content, but that sufficient natural moisture from the fruit be removed, but there's room for it to absorb the flavoring solution and the acidulant. And the specification tells you what amounts of flavoring solution and acidulant are needed in order for the process of this invention to work. So the district court's construction of dried fruit was actually a two-part construction, and the first part of the construction said that dried fruit is fruit from which natural moisture has been removed. And that's correct. We can agree with that. In fact, that's the definition that's supported by the intrinsic and extrinsic evidence in the record, including the specification which includes embodiments such as the prunes and peaches, apples, and pears that have more than 10 to 18 percent moisture in them. Well, why did they put in there, why did the patentee go to the trouble to say in the detailed description of the invention, the very first paragraph, I'm going to read it out loud, any dried fruit which contains between about 10 percent to 18 percent moisture may be employed. That calls out a specific range, and then you go to the claims and it uses the phrase dried fruit. Well, you could have defined it in some, you know, the patentee has the right to define dried fruit means, didn't do that here except this is as close as it comes is this one sentence. So why is it that we have to jump through a million hoops trying to read your mind and read the mind of the patentee whenever it says in one sentence, any dried fruit which contains between, wouldn't the ordinary person of skill in the art have said, okay, that's what they mean is 10 to 18 percent. That's what the district judge thought here. First, John, I would agree that that is the only place where the 10 to 18 percent moisture limit is. One place is enough. There is no other contrary definition. Under this court's precedent, unless the patentee gives an express definition, which this is not, there is no, you could have given a definition. We could have given a definition. You could have. You could have eliminated all this headache and by giving us a clear cut definition, you chose not to do that. Instead, you put this sentence in there for wiggle room. So you could wiggle around, once you got it through the PTO, you could then say, oh, no, we didn't mean 10 to 18 percent. We meant all these other things. And now, so you throw in the poor district judge on to the problem of trying to divine out of this something different from 10 to 18 percent. Respectfully, Your Honor, I disagree. I do agree that a patentee can act as its own lexicographer. I do also think that this court's precedent says that it does not have to. If the meaning of a term is known to those of skill in the art, which the meaning of skill in the art and was known, even though to those of us who are not skilled in the art of food science, we may say, oh, well, what does dried fruit mean? We're not really sure. And that may include the judge, but that's not who the patent is speaking to. In construing a patent claim, we're not asking whether it is understandable to a judge or to a lawyer. We're asking whether it's understandable to one of ordinary skill in the art and what the understanding of those of skill in the art is about the meaning of the claim. Well, then, what is the purpose of the sentence, any dried fruit which contains between 10 to 18 percent may be employed? Because that's absolutely true. Any dried fruit that contains between 10 and 18 percent may be employed. But also prunes, apples, peaches, pears, other dried fruits may also be employed. Even containing 90 percent or 87 percent moisture? No, Your Honor. If it contains 87 or 90 percent moisture, if it's natural moisture, if it's the natural moisture of the fruit and it contains 87 to 90 percent of its natural moisture and it started out with 87 to 90 percent natural moisture, then it would not work in the context of this invention. But we have to look at the... First I'd like to point out, the district court relied on a dictionary definition at the time of issuing its claim construction that construed the term dried as an adjective applied to food. And that dictionary definition said that dried as an adjective applied to food means preserved by removing natural moisture. Everyone of skill in the art understands that natural moisture is what you're talking about when you're talking about drying a fruit. In fact, Ocean Spray's Mr. Mantious, their dried fruit specialist who developed the accused process, refers at page A392 of the appendix to removing the natural waters of the fruit. And Mr. Mantious also at his deposition when asked point blank, does the term dried fruit mean 10 to 18 percent moisture, said it does not. Mr. Mantious does not believe that a moisture range of 10 to 18 percent is proper for the definition of dried fruit. Ocean Spray's opinion council that issued a non-infringement opinion prior to the litigation did not believe that a moisture content range of 10 to 18 percent was proper. And nothing, nothing suggests that this patent claim would be limited to a moisture range of 10 to 18 percent. Yes, it covers fruit that has 10 to 18 percent moisture. Any fruit that has 10 to 18 percent moisture would be covered. But it also covers many other things. What's the point of putting that sentence in there? The way you want to read it is any fruit which contains between 10 to 18 percent moisture may be employed, but then you want to say, but it could be 19, 20, 21, all the way up to some high number that we don't know. So I don't understand why it would have been 10 to 18 percent was at very specific range was called out if that sentence is now supposed to be disregarded. I would suggest that that sentence is additional to the sentence that precedes it, which includes fruits that contain much higher than 10 to 18 percent moisture. And all of the evidence of the record, despite what any of us may think or anyone who's not skilled in the art may think, all of the evidence in the record is that people of skill in the art understood what dried fruit means and that they understood that it had absolutely nothing to do with the arbitrary moisture range of 10 to 18 percent, which would really limit the scope of this invention to store-bought raisins off the shelf. And this invention clearly applies to much more than that. So whatever the disagreement there, the district court's construction disregarded the statements by Ocean Spray's dried fruit specialist, Mr. Mantius. It disregarded its own dictionary definition that said preserved by removing natural, again natural is in that dictionary definition, moisture. That's not something that Amaze and Raisins just came up with out of the blue. That's something that has been discussed by Mr. Mantius. It's in the dictionary definitions of dried in the context of an adjective talking about food products. So in any event, Mr. Mantius, Ocean Spray's developer of its accused process, agreed at his deposition that the de-characterized fruit pieces of Ocean Spray's process are the dried fruit in that process. Now regardless of how we view the literal infringement issue in this case, the record evidence shows that the Ocean Spray process infringes under the doctrine of equivalence. There is specific evidence in the record that each of these claim limitations at issue is present either literally or by its equivalent. And with respect to this point, I'm addressing the dried fruit limitation specifically. Mr. Mantius at his deposition explained that the de-characterized cranberry pieces in Ocean Spray's process do the same function in the same way to achieve the same result as the claim in the patent. And specifically the function of the dried fruit and the de-characterized fruit in Ocean Spray's process is to act as a carrier for the infusion syrup and the sigillate. And the dried fruit disclosed in the patent does that. The de-characterized fruit in Ocean Spray's process, according to Mr. Mantius who developed the process, does that. Now it does that by having had a portion of the natural moisture removed to leave room to add the sigillate and the new flavoring syrup. Now that's what happens in the patent specification in claim one of the patent. And Mr. Mantius said that's exactly what happens with the de-characterized fruit pieces in Ocean Spray's process. He said at his deposition, the purpose, the reason we take all the natural moisture out through the de-characterization is so that we can have the natural moisture removed, the fruit still intact, and then re-engineer it, re-characterize it with this new flavoring syrup and a sigillate. Well that's exactly what the disclosure of our patent is. And the result of course in both instances is a flavored dried fruit product that has a flavor different from the natural flavor of the dried fruit. So the evidence in the record is that Ocean Spray's process does the same function in the same way to achieve the same result as claim one of the patent in suit. The district court disregarded this evidence and referred to the doctrines of claim vitiation and prosecution history estoppel which I respectfully suggest do not apply under the facts of this case. Now the confusion I think that happened there was a differentiation between dry and wet. And in the context of fruit and in the context of this invention, which is the context that has to be applied in considering the doctrine of equivalence, the distinction is not between wet fruit and dry fruit, it's between fresh fruit and dried fruit. And any distinction that was ever made by Amaze and Raisins during the prosecution history was to distinguish prior art that used fresh or frozen fruit having all of its natural moisture content remaining. That was the Argawalla reference. It was fresh and frozen fruit, all the natural moisture content was there, that was distinguished. But there's no dispute that Ocean Spray's process doesn't use fresh or frozen fruit. The fruit that goes into the counter current infuser, which is where the flavoring syrup and the acetylene are added, is the de-characterized fruit piece that has had all of its natural moisture removed. In fact, all the juice is taken out. That's what Ocean Spray uses to make its juices that it sells in the stores. And that fruit piece is wet, yes, but it also has none of its natural moisture content remaining. And there's no dispute that that fruit piece, the de-characterized fruit piece, isn't fresh fruit, it's not dried fruit. So there can't be claim vitiation here because we still have an exclusion of fresh and frozen fruit. And there's no prosecution history estoppel because the only arguments that Amazin' Raisins ever made during prosecution were to distinguish the fresh and frozen fruit, never to distinguish the wet fruit. Now, an example is if you took a box of raisins and you dumped it in a cup of water, would they be wet? Yes. Are they still dried fruit? Yes. And if you take an apple, a fresh apple, and you wash it under the sink and you pull it out, is it wet? Yes. Is it fresh? Yes. Wet fruit does not describe any class or category of fruit, it just describes a state of whether it's in water or has water attached to it or clinging to it. And so the difference here between the classes of fruit is between fresh fruit or frozen fruit having the natural moisture content and the dried fruit that does not. So the district court erred at least in resolving the fact issues on doctrine of equivalence. And no matter how much you may think that wet fruit can't be dried fruit under equivalence, there's no legal preclusion. The facts are in the record showing that it performs the same function in the same way to achieve the same result. And under this court's precedent, that creates a fact issue sufficient to be remanded for at least a determination of infringement under the doctrine of equivalence. And I see that I'm into my rebuttal time, so I will save your rebuttal time, Mr. Snow. Good morning. May it please the court. My name is Jeffrey Snow. I represent the appellee, Ocean Spray Cranberries. The issues before the court on appeal are actually very simple. The district court was easily able to determine non-infringement on summary judgment on an undisputed record. What's happening here is that the appellant, Amazon Raisins, has been advocating some unsupportable claim constructions. They would have to have you believe that dried means wet, and they'd also have to have you believe that removed means add, but that can't be right. There's no infringement here because Ocean Spray's accused process does not use an acidulant to remove flavor, and it does not treat a dried fruit. They're not saying dried should be wet. They're saying maybe 20, 25, 40% liquid is still within the category of dried fruit. They're not saying that none of the moisture can be removed. No, but dried has to have a meaning. On its own, it means that a substantial amount of the water is removed. The district court in performing the claim construction came up with a formulation based on what's specifically stated in the specification about how low that moisture level needs to be. They said the 12 to 18%. That makes sense. That provides the guidance of what it means to be a dried fruit, and that is a fruit to which the claimed process is applied. All right, that isn't what you were telling us. You were saying it can be completely wet? No, we're not talking about making completely wet. Dried fruit needs to be dried, but what's happening in the accused process is that there's no drying that happens before the step where the acidulant is applied to the fruit pieces. The concept of dried fruit cannot apply. You're not treating a dried fruit in the ocean spray process. In the ocean spray process, the fruit has what percent moisture? At the beginning of the process, after the fruit is just going to be fed into the extractor mechanism, it's clear and undisputed that the moisture content is approximately 92%, 87 to 90%. At the beginning, what about after it goes through the extraction? At the end of the extraction, there is testimony that there's at least the same moisture level after the extraction. In fact, it is shown to be dripping, soaking wet. The photographs that were taken of the fruit- You're saying nothing is extracted, then why do you have an extraction process? What's extracted are the juices and the sugars that are in the cranberries, and those are removed and used for different purposes for making cranberries. I think that was the question. Then what's the percentage moisture after you remove the juices? The testimony is that it is the same moisture level as when it started with the extractor, so it's 90%. I don't understand what you're saying. You're saying that it comes in and it's 90% juice, then we remove the juices and it's still 90% juice? Well, it's 90% of a moisture level. What is removed with the juices and the sugars, those are soluble solids. The moisture level, the amount of water ends up being the same because it's just as wet when it started. What you've taken out are the juices and the sugars and replaced them with water. You're saying juices are not wet? I don't understand what you're saying. I think a direct answer would be helpful. Juices are wet, but they are moisture. They have a water content, and the juices that contain the water and the flavors and sugars are all removed, and it's replaced with just plain water in the extraction process. I agree with Judge Newman. You're not being clear. The process starts with treating a dried fruit. That is the claim limitation that is being contested. I think you said that that dried fruit is approximately 90% moisture. Right? That's why you're not within the scope of the claim? Right. The fruit pieces that are treated in the infusion step where the acidulant is present have about a 90% moisture level. I don't think you can even characterize them as dried fruit, and that's why in the ocean spray process they're called decharacterized fruit. They're decharacterized because the flavor has been substantially removed, the juices. Was that natural moisture? Your opponent said your product, she was emphasizing natural moisture. Is your dried fruit that is treated with an acidulant 90% natural moisture? It is the same level as naturally occurring. It's not the same water molecules that were in the fruit to begin with. The water replaces the juices. However, it is still a moisture content. But the starting material, the dried fruit which is treated with an acidulant before anything has been replaced, that starting material you said is 90%, and that is natural moisture? 90% is the natural moisture level. It is not the water that occurs in the fruit naturally. It is put into the fruit. Some of it is replaced into the fruit through the extraction process when the juices and the sugars are removed, and that's why the flavor. I'll ask you once more. After the natural juices are removed, what is the percentage of moisture in that product? The testimony on the record is that it's a 90% moisture level. So you start with 90%, you remove the juices, and you're left with 90%? Yes. It starts off with a different kind of moisture. It's the juices and the soluble sugars which are washed out and replaced with just plain water. Before the replacement, I ask before the replacement, after you remove the juices, what percent of moisture is left? Well, in the extraction process, it's a continuous process where water is fed over the cranberries so that as the juices and sugars are removed by this osmosis process into the water, that is replaced in the cranberry hulls with water. That wasn't the question I asked you. I said after the juices, the natural juices are removed, what is the percent moisture in the product? Not after you replace what's been removed. There's no point in which there's moisture that's been removed that hasn't been replaced with water because it's happening all at the same time. Does that answer your question? You're saying it's a continuous process. It's a continuous process. What happens in this extractor is the fruit pieces are moved up slowly uphill. As they are, water is pushed down on them. As the water is pushed down, it is pulling the juice and the sugars out. What's pulled out is then replaced by the water that is forced in through the extractor. These are contiguous steps. Yes, it's all happening at the same time. Why can't the natural juice come out at all? The concentration of juice is much higher in the cranberry at the beginning of the extraction process compared to the water. Because of the acid differences and the other differences in concentration, then the juice and the sugars and the acid are going to be flowing out of the fruit into the water. Let me see if I understand what you're saying in response to Judge Newman. You're saying that in the extraction step where the water and the permeate is poured over the cranberries, the natural juices are gradually removed so that that percentage goes down but that the water that replaces it does it so simultaneously so that that at any given point in that process, the overall moisture content remains approximately the same. That's right. You're saying if I take a bowl of cranberries and put it in water and let it sit there, soon all the cranberry juice inside the cranberries will be replaced by plain water. Well, I think in a process where you have it sitting in a bowl, it's not going to be quite as efficient as in this extractor where you're moving the cranberries, pushing water against them and the water is forcibly pushed against the cranberries to remove the sugars and the juices. It's not just because they're sitting there because there's a physical process going on. There's motion between the cranberries and the water. You're saying in your continuous process, there is no point at which there is less than 90% moisture in any of the product moving through that process? In the extractor step, that's right. There is always a very high... I think you're qualifying the question. I asked you if there was any point as you move the cranberries through the process at which the moisture content is less than the 90% that you keep telling us is continuously present in the cranberries. That's right. That is the fruit to which the infusion process is then applied. I'll have to reread what's in the record. That doesn't quite match my memory of the description of the process by your expert. Okay. If it would be helpful, we can actually review the process a little bit. There's a diagram of the process that's in the Joint Appendix on page 597. Taking it from the beginning, how the fruit, the thawed frozen fruit, is put into the extractor. Water is forced over the fruit to remove the juice and the sugars, leaving what's left as a hull that has nearly all of the sugar acids and the flavors. Substantially, all the flavors have been removed at that point, leaving a cranberry hull that has been a slight acid bite. It is those fruit pieces that are then put into the infuser, which is the next step. What is the moisture content of the hull? The hull at the time that it finishes the extractor is the same as when it went in, which is that 90% level, because the juices have been replaced with just water. That wasn't my question. It is a 90% level. At the point at which the hull is produced in the process, what is the moisture content? The moisture content doesn't change from the 90% level at all. It is just a hull that's filled with water. That piece of fruit has that 90% moisture level. You say that there is never a point at which a dried hull containing less than 90% appears in the process. That would be right. In the next step, those hulls, which are soaking wet as a result of the extraction, are put into the infuser. The infuser works with the same mechanism that it moves those fruit pieces uphill and forced down over them is an infusion syrup. That contains the acidulant citric acid, sugars, and dyes. In the course of that process, in the motion of the cranberries against the infusion syrup, some of the water that had been in there, some of that moisture, is going to be replaced by the soluble solids of the infusion syrup, which would be the acids and the sugars. It is after that that the fruit pieces are then dried in the subsequent processing processes. When they come out of the infuser, the percentage is 46 to 60%, according to the expert. I'm your own expert. I'm reading it right now. Before it goes into the dryer, it's 46 to 60%. Then when it comes out of the dryer, it's 18%. Isn't that right? That's right. After the infusion, the moisture level will go down. That's because some of the water in the infusion step is being replaced by the soluble solids of the infusion syrup, which includes the sugars and the citric acid. Didn't I hear you say there was no point in the process at which the moisture content went below 90%? The process up until the point where the infusion syrup is put into the fruit. That wasn't my question. That may have been your answer. Do you not understand my question? Right. At the end of the drying process, at the end, there is a dried fruit. The fruit is the moisture level will be removed upon drying. Is there any other point you want to tell us in your minute that's left? The district court properly construed the removal claim limitation. The claim says remove. It doesn't say add. It could have said something else. It could have said add or masking flavor with the acidulant, but it didn't. The claim says remove. All the intrinsic evidence points to the same thing. It says using acidulant to remove the flavor. The specification separately talks about using the acidulant to add flavor. It separately and distinctly talks about that as another function of the acidulant, but it does talk about removing. The claim does require removing, and that is a physical process to remove it. I have a few seconds to talk about the dried fruit limitation, but in order to be dried, the substantial moisture has to be removed. The claim construction that the court did was correct in that it provides the guidance to show that that's the amount of moisture that's remaining. I see that I'm out of time. Thank you, Mr. Snow. Thank you. Thank you, Your Honor. I think that the issue or the source of the confusion here is that Ocean Spray has come up with a process for drying its cranberry pieces that uses water, and then to confuse the issue, they talk about wet not being dry. I think if we keep our focus in the proper context, which is that dried fruit is distinct from fresh fruit, not from wet fruit, because dried fruit can be wet. You keep saying that like the water is dripping on the outside. The water goes inside. The water that the natural juice is on the inside is replaced in the permeate step by water going to the inside of the cranberries. It's not just dripping on the… It is dripping on the outside, of course, but it's also inside there, and you're trying to make us believe it's like an apple that you wash under the faucet. It's not. This process has… These cranberries are chock full of water on the inside when they come out of the extractor. Your Honor, the evidence is that these cranberries are sliced before they're put into the extractor, so imagine a half of a cranberry with all of the natural juices removed, and it's been replaced by water. What happens if you tip it upside down? Exactly what happened, as the evidence in this case shows, when Ocean Spray's employee, Judge Newman, Michael Scott, took a scoop of the de-characterized cranberries coming out of the counter-current extractor, which is where the juices are replaced by water. He shook it and tried to get off as much of the water on the outside as he could, and he put it in a bag, and he tried to vacuum seal it, and he couldn't because so much water kept coming out of those de-characterized cranberries that the vacuum sealer wouldn't work. Mr. Snow, in answering Judge Newman's questions, continually refers to coming out of the counter-current extractor because that's where Ocean Spray has to put the focus in to get 90% number the same. The evidence is that it travels from the counter-current extractor to the counter-current infuser, and that's where the flavoring solution and the acidulant, which is where we start this patent, that's where the flavoring syrup and the acidulant are added. When it reaches the counter-current infuser, the evidence shows, I think, a reasonable inference that the moisture content has declined by at least some significant amount. As Your Honor said, when it comes out of the counter-current infuser, the moisture content is much less than the 90%. It's between 46% and 60%, and that's after they've added the water. Going into the infuser after the water that's been put into these cranberries in the de-characterization process has had time to leak and leach out. The hull itself is not any more moisture content. It's a cup full of water. It's wet, but if you tip it over, the water leaves, and the cup is now dry. There are many ways of drying fruit. You can do it with wind. You can do it with heat. You can do it with sun. You can do it with chemicals, and you can also, I would submit, do it with water. When you take out the natural juice, which I think if you get down to what Ocean Spray has argued, they do admit that they do take out, in fact, almost all of the natural juice of the fruit. That's a good question. We haven't had time to go into this, but a totally different step here is, as I read this, is that the acidulant has to substantially remove the natural flavor, and in the accused process, the acidulant is added well after the flavor has been removed, the natural flavor has been removed. So, you then say, no, substantially remove means mask and add to. It doesn't mean remove. Well, that was a claim construction argument we made, Your Honor, but the summary judgment has to be reversed here on that basis, even without that construction, because the facts are, no matter what is said here today, the facts in the record are, from Mr. Mantia, is that the cranberries going into the countercurrent infuser, where the acidulant is added, still have a bitter, slight cranberry taste. All of the flavor has not been removed. It still has a cranberry taste. That's in the record. But it's been substantially removed. Well, what we're talking about with the use of the acidulant is removing the flavor of the dried fruit. The dried fruit is the de-characterized cranberry that's entering the infuser, and that de-characterized cranberry, the evidence is undisputed, has a cranberry taste. When it goes into the infuser, the acidulant, citric acid, in the exact same amount and for the exact same period of time as is disclosed in the preferred ranges of the patent, is added to that de-characterized cranberry piece, and when it comes out of this countercurrent infuser, it no longer tastes like a cranberry. That's the evidence. But the original flavor, even in those parts that go into the infuser, that flavor has not been removed. It's just been covered up with the tart taste. No, Your Honor. Respectfully, I think the evidence supports either inference. I think that the evidence is that it has the taste of a cranberry before it goes in, the acidulant is applied, the exact same acidulant in the same period of time in the same amount, and afterward, it no longer tastes like a cranberry. And we are at the summary judgment stage here, which is, I think, important to remember. And the inference to be drawn from the fact that the flavor is there, the acidulant is no longer there, I think the reasonable inference that comes from those facts is that the acidulant removes the flavor. Now, Ocean Spray's argument is that they intend for the acidulant to add flavor, not to remove  But their intent is, of course, irrelevant to the issue of infringement. The question on infringement is, is the acidulant added in an amount of time and in an amount sufficient to remove the natural flavor of those de-characterized cranberries? There's no question those de-characterized cranberries, which I would call dried fruit, have a cranberry taste. There's no question the acidulant is added, and there's no question that after that, it no longer tastes like a cranberry. And I think the question you're raising about whether it's because of the flavoring syrup or because of the acidulant is a great one for the jury. But it's not appropriate on summary judgment, where there are two reasonable inferences to be drawn, and the evidence is that the flavor's there, the acidulant's added, the flavor is gone. There's no evidence been adduced by Ocean Spray other than its intent to suggest that it's not the acidulant doing exactly what the patent says it's going to do. And unless there are any further questions, I'm out of time. Any more questions? Thank you, Your Honor. Thank you, Ms. Zimmerman. Mr. Snow, the case is taken under submission.